**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

WINFRED L. EATON,                              :

     Plaintiff,                              :

vs.                                             :     CA 14-00449-C

CAROLYN W. COLVIN,                             :
Acting Commissioner of Social Security,

                                          :

     Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g), seeking judicial review of a final decision of the Commissioner of Social Security denying him claims for period of disability and disability insurance benefits. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court.  (Docs. 17 & 18 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.")).  Upon consideration of the administrative record, the Plaintiff's brief, the Commissioner's brief, and the arguments of counsel for the Parties at the October 29, 2015 hearing before the Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

Plaintiff alleges disability due to hypertension, status post coronary artery bypass graft ("CABG") times 3, coronary artery disease ("CAD"), diabetes mellitus, affective

---

[1]     Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 17 & 18 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

disorder, cognitive disorder, and generalized anxiety disorder ("GAD"). The Administrative Law Judge ("ALJ") made the following relevant findings:

> **1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.**
>
> **2.     The claimant has not engaged in substantial gainful activity since June 16, 2011, the alleged onset date (20 CFR 404.1571 et seq.).**
>
> **3.     The claimant has the following severe impairments: hypertension, status post coronary artery bypass graft (CABG) times 3, coronary artery disease (CAD), diabetes mellitus, affective disorder, cognitive disorder, and generalized anxiety disorder (GAD) (20 CFR 404.1520(c)).**

The claimant underwent a 3 vessel CABG in April 2007. His prognosis was noted to be "good" when he was discharged from the hospital. (Exhibit 1F). The claimant is treated for hypertension, CAD, and diabetes mellitus by Peter C. Coats, MD, an internist. (Exhibits 4F, 15F, and 19F). Deborah J. Hart, MD, a psychiatrist, has diagnosed the claimant with organic affective and cognitive disorder due to general medical condition and GAD. (Exhibits 5F, 7F, 10F, and 20F).

The claimant has reported difficulties with some activities of daily living due to chronic neck and shoulder pain. (Exhibits 2E, 5E, and 6E). The claimant was treated in the emergency room prior to the period at issue on April 12, 2010, for a 3 day history of tightness in his upper back and neck. The physical exam showed some muscle spasm and pain on palpation in the upper back. The claimant had no focal neurological deficits. He was assessed with upper back strain with muscle spasm and treated with injections of Toradol, Dilaudid, and Valium. He reported feeling much better, and was given prescriptions for Percocet, Motrin, and Soma. (Exhibit 2F).

The claimant saw Dr. Coats on April 19, 2010, for some left sided neck and shoulder pain and muscle tightness, which the claimant felt was "all completely due to stress of findings out that his PSA was high." He had no neurological complaints or arm symptoms at that time. Dr. Coats noted his neck and shoulder range of motion was good with no crepitance or swelling, and his upper back muscles were tight. He assisted the claimant with situational anxiety and *probable* mild osteoarthritis of the neck. Dr. Coats gave the claimant Paroxetine and told him to take ibuprofen as needed. (Exhibit 4F).

The claimant saw Kevin Donahoe, MD, an orthopedist, 3 times between April 23 and May 7, 2010, for neck and shoulder pain. The claimant rated his pain a 6/10 on the pain scale (0 = no pain, 10 = worst possible pain)

and said any overhead work is painful.  X-rays showed normal shoulders and anterior osteophytes at C5-6, some mild straightening, and spondylosis.  Dr. Donahoe assessed him with left trapezial pain and cervical spondylosis, which he treated with Depo-Medrol injections and physical therapy.  By May 7, 2010, the claimant said he was doing much better with physical therapy and modalities.  (Exhibit 3F).

On September 24, 2010, Dr. Coats noted the claimant complained of upper mid thoracic discomfort *periodically* that was *mild to moderate.*  The claimant related this to reaching above his head all the time while working.  Dr. Coats noted the claimant sits with terrible posture with kyphosis, but he had no bony tenderness.  He assessed the claimant with upper back pain due to poor posture.  (Exhibit 4F).  The claimant went to the emergency room most recently for a pulled muscle in his back on December 20, 2011.  He said he has been "picking up his father [due to] him being sick."  The claimant said his pain was a 7/10 on presentation, and was a 0/10 after Nubain and Norflex injections.  He was given prescriptions for Vicoprofen and Flexeril. (Exhibit 14F).

In terms of the claimant's neck and shoulder complaints, he was diagnosed with cervical spondylosis by an orthopedist in April 2010.  However, he has not followed up with Dr. Donahoe since May 2010.  (Exhibit 3F).  He has sought some sporadic treatment with Dr. Coats and in the emergency room for neck and shoulder pain complaints, but has attributed these complaints to acute exacerbations and stress.  Interestingly, Dr. Hart, the claimant's psychiatrist, has continued to prescribe pain management medications including opiates and muscle relaxers rather than his primary care physician or orthopedist.  (Exhibits 5F 7F, 10F, and 20F).  Yet, Dr. Donahoe's physical exams showed improvement in symptoms within weeks and objective tests showed only mild findings.  Therefore, the undersigned finds that this impairment has no more than a minimal effect on the claimant's work-related functioning and is therefore non-severe.

While the claimant's cervical spondylosis is non-severe, the undersigned has considered the limiting effects of all of the claimant's medically determinable impairments, including those that are not "severe," as explained in 20 CFR 404.1520(c), 404.1521, and 404.1523, when assessing the claimant's residual functional capacity (20 CFR 404.1545(a)(2) and 404.1545(e)).  The undersigned notes the record contains multiple references to these symptoms related to overhead reaching, which are allowed for with the limit on overhead reaching in the residual functional capacity set forth below.

**4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

*     *     *

**5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), in function by function terms (SSRs 83-10 and 06-8p), with certain non-exertional restrictions associated with that level of exertion. The claimant's specific capabilities during the period of adjudication have been the ability to sit for 6 hours in an 8-hour day; stand or walk 6 hours in an 8-hour day; frequently lift 25 pounds and occasionally lift 50 pounds; occasionally perform overhead work and push/pull arm controls; and frequently push/pull leg controls. The claimant could work in a job that would not require him to climb ropes/ladders/scaffolds, work at unprotected heights or around dangerous machinery, or operate automotive equipment; and would not require concentrated exposure of 5 minutes or more to temperature extremes (such as the cold you would encounter in a freezer or heat such as that given off by a blow torch). The claimant could perform simple, routine, repetitive tasks; have occasional contact with the public; could work in close proximity to coworkers and supervisors, but would work best independently; and occasionally adapt to changes in work setting that are introduced gradually over the course of 1-2 days.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the

intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant alleges that his ability to work is limited by organic affective disorder, depressive disorder, coronary insufficiency, and essential hypertension. (Exhibits 2E and 9E). The claimant completed 1 year of college and completed specialized job training in truck driving and earned a commercial driver's license in December 2008. (Exhibit 2E). The claimant has taken Alprazolam and Paroxetine for depression and anxiety/nerves; aspirin for heart health; Carisoprodol, Flexeril, and Soma for pain/spasms; Metformin for diabetes; Metoprolol, Amlodipine, Lisinopril, and Norvasc for hypertension; Meloxicam for arthritic pain; and Vicoprofen for back pain. (Exhibits 2E, 9E, and BE).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

The claimant has hypertension, CAD status post CABG, and diabetes, which results in the limitation on his ability to sit for 6 hours in an 8-hour day; stand or walk 6 hours in an 8-hour day; frequently lift 25 pounds and occasionally lift 50 pounds; occasionally perform overhead work and push/pull arm controls; frequently push/pull leg controls; work in a job that would not require him to climb ropes/ladders/scaffolds, work at unprotected heights or around dangerous machinery, or operate automotive equipment; and work in a job that would not require concentrated exposure of 5 minutes or more to temperature extremes.

Dr. Coats has followed the claimant for hypertension, CAD status post CABG, and diabetes. His checkups reflect generally no ongoing complaints, and the claimant reported that he was tolerating his medications well. On April 22, 2011, the claimant denied pain, shortness of breath, medication side effects, gastrointestinal, or genitourinary complaints. He assessed the claimant with uncontrolled hypertension, but noted the claimant does not check his blood pressure. He also assessed him with CAD and glucose intolerance. (Exhibits 4F and 15F).

The claimant saw Dr. Coats for a check up on August 27, 2012, after not being seen since December 2011.  The claimant told Dr. Coats that he has been seeing Dr. Hart for depression.  Dr. Coats noted the claimant has not worked in about 14 or 15 months.  The claimant said, "I just can't do it anymore doc.  I've been weak and sore forever, so I put in for disability."  However, Dr. Coats said, "I see no reason medically why he should be disabled, but he will work this out with the disability office."  The claimant had no physical complaints and needed refills on his medications.  Dr. Coats noted the claimant denied pain, shortness of breath, gastrointestinal issues, polyuria, polydipsia, or unintentional weight loss.  The physical exam showed mild diastolic elevation; but his lungs were clear, and his heart had regular rhythm and rate without murmur, gallop or rub.  Dr. Coats said the claimant was neurologically normal, and he did not appear to be in any discomfort.  Dr. Coats assessed him with known coronary disease, hypertension, former smoker, and diabetes.  He planned to continue the claimant's medications as previously prescribed.  (Exhibit 19F).

Although the claimant was diagnosed with hypertension and CAD status post CABG, and he has been observed to have mild diastolic elevations.  However, evaluations during the period at issue have failed to identify any significant ongoing complications from his cardiac impairments.  For example, chest x-rays and EKG testing have documented no end-organ cardiovascular damage. His pharmacologic stress test in September 2010 was negative for ischemia, but notable for systolic and diastolic hypertension throughout.  The claimant had normal perfusion scars with mild diaphragmatic attenuation and ejection fraction of the left ventricle was normal at 53% with good systolic thickening.  (Exhibit 6F).  The claimant had an EKG on January 18, 2012, which showed sinus rhythm and no reported abnormalities. (Exhibit 14F).

The claimant saw Glenn Cochran, MD, his cardiologist, on September 6, 2011, for a routine yearly follow-up.  Dr. Cochran said the claimant was currently asymptomatic, and no associated symptoms were reported.  The claimant told Dr. Cochran that he had been doing well with his CAD symptoms since the last visit.  Dr. Cochran noted the claimant has no comorbid illness, no known CAD complications, and no significant interval events.  The claimant also reported that his blood pressure has been stable since his last visit.  Dr. Cochran noted the claimant has no focal neurologic deficits and no memory loss.  (Exhibit 6F).

The claimant's diagnosed diabetes mellitus has been shown to respond well to properly administered conservative treatment, and the record contains no indication of end-organ damage, such as neuropathy, retinopathy, or kidney involvement.  With a normal range of 65-99, the

claimant's glucose level has been slightly high at 118 in April 2, 2010, was normal at 97 in September 2010, was 102 in April 2011, was 117 in December 2011, and was 100 in January 2012. The claimant's A1c was within the normal limits of 4.8-5.6 during the period at issue until recently. (Exhibits 4F, 14F, and 15F). The claimant's August 27, 2012, labs showed his glucose was high at 163 and his A1c was slightly high at 5.7. (Exhibit 19F).

The claimant testified that the primary reason he cannot work is because of medication side effects. He testified that his medications make him sleepy and he spends the majority of his day sleeping. However, he has reported that neck and shoulder pain prohibit him from sleeping. (Exhibit 6E). He also testified that he sleeps about 2-3 hours a day, but is unable to sleep at night because he cannot seem to relax. The claimant has reported Carisoprodol and Flexeril cause dizziness and Vicoprofen causes drowsiness. (Exhibit 9E). While the claimant indicated multiple side effects in check box forms he completed in Dr. Hart's office, there is no record of the claimant complaining of medication side effects to his primary care physician, Dr. Coats, or to his orthopedist. On the contrary, Dr. Coats' records consistently note the claimant reported no medication side effects. In fact, the only time the claimant told Dr. Coats that he could not sleep well, he attributed it to head congestion with persistent nocturnal cough. Dr. Coats gave him Robitussin AC for a viral upper respiratory infection. (Exhibit 15F). The residual functional capacity does accommodate the claimant's allegations regarding medication side effects with the limit to simple, routine, repetitive tasks and the limits on working at unprotected heights or around dangerous machinery, or operating automotive equipment. As noted above, the claimant's alleged neck pain is also allowed for with the limit on performing occasional work overhead.

The claimant has affective disorder, cognitive disorder, and GAD, which results in the limitation on his ability to perform simple, routine, repetitive tasks; have occasional contact with the public; could work in close proximity to coworkers and supervisors, but would work best independently; and occasionally adapt to changes in work setting, that are introduced gradually over the course of 1-2 days.

Dr. Hart has diagnosed the claimant with organic affective and cognitive disorder secondary to neurotoxin exposure; GAD; chronic, persistent pain disorder; and chronic insomnia due to medical condition. Dr. Hart's mental status generally exams show dysthymic or depressed mood, and reports of generalized anxiety, fatigue, apathy, and feelings of helplessness. However, she has noted the claimant was alert, cooperative, fully oriented, behaved appropriately, had

logical/goal oriented/coherent thought process, and adequate impulse control, judgment, and insight.  (Exhibit 5F and 20F).

The claimant completed a Functional Ability Questionnaire on March 10, 2011, and scored a 70% functional ability score.  Dr. Hart has completed several forms on the claimant's behalf for him to obtain a medical leave of absence from work and short term disability benefits beginning on June 16, 2011.  At that time, she said his condition started on June 16, 2011, and noted he was undergoing evaluations and treatment.  However, Dr. Hart said he has not been admitted for an overnight stay in the hospital.  She said he was unable to perform his job functions including climbing stairs, lifting overhead, and working in extreme heat.  At that time, she estimated the claimant would have a 3-month period of incapacity.  However, she completed another form on June 23, 2011, and stated the claimant is totally disabled.  She said his ability to return to work was "pending further diagnostic evaluation."  (Exhibit 5F).

Dr. Hart wrote additional letters for the claimant's short term disability carrier on November 3 and November 27, 2011, and said the claimant "remains in active medical treatment with medical leave of absence from all occupational duties."  She noted a return to duty was not expected in the near future, and the claimant was investigating the possibility of long term disability options.  (Exhibit 8F).

On November 10, 2011, Dr. Hart wrote a letter stating the claimant worked at a plant where he was exposed to neurotoxins including Carbon Disulfide and Hydrogen Sulfide.  She said exposure to these toxins can cause neurophysiological impairments, and the focus of the claimant's initial treatment had been to minimize the debilitating effects of the neurological and psychological symptoms, prevent further deterioration in his mental status, and promote a reasonably stable quality of life despite the limitations imposed by his impairments.  Dr. Hart identified neuro-cognitive and psychological symptoms in the claimant's initial evaluation as instability of mood and volatility of affect, social isolation, avoidance behavior, insomnia, low self-worth, self-denigration, dysthymia, anhedonia, and *passive* suicidal ideations.  She said his problems with affective instability and volatility in mood are worsened by stressful situations and unpredictable environments.  Dr. Hart diagnosed the claimant with organic affective and cognitive disorder secondary to neurotoxin exposure; GAD; chronic, persistent pain disorder; and chronic insomnia due to medical condition.  She assigned a global assessment of functioning (GAF) score of 49.  (Exhibit 7F).  However, on November 28, 2011, Dr. Hart said the claimant was stable overall, and his psychiatric symptoms remained unchanged.  She said the claimant "remains on medical leave, as he has not reached a

point physically where he is able to resume his previous level of physical activity." (Exhibit 1OF).

As noted above, the claimant underwent a consultative psychological exam on November 29, 2011, with Dr. Davis.  The claimant described his disability to Dr. Davis as being nervous and depressed, which was diagnosed in 2010.  The claimant also stated that he has not been able to do much work after his open heart surgery in 2007.  He states additional stress in his life as not being able to socialize as much as before, and he is very frustrated that he is unable to work.  He reported no previous mental health treatment.  At the time of the exam, he was taking Lortab, Soma, Paxil, Viagra, Flomax, Norvasc, Metoprolol, Metforrnin, and Lisinopril.  He stated the medication helps some, but he still feels pain.  At the time of the exam, the claimant was employed at Ingalls Shipyard where he had worked as a pipe installer for the past 5 years. (Exhibit 9F).

On mental status exam, the claimant showed some anxiety and depression, but had the capacity for a full range of emotional qualities.  Dr. Davis said he seemed to have the capacity for a positive affect, although his mood was generally one of depression.  Dr. Davis said there were no indications of deficits in his overall concentration and attention.  His immediate, recent, and remote memory was intact.  No confusion was seen, and his thought processes had no abnormalities.  His judgment and insight were good.  Dr. Davis diagnosed the claimant with depression secondary to a general medical condition.  He said the claimant's prognosis was guarded, but said it is reasonable to expect a favorable response to treatment within the next 6 to 12 months.  (Exhibit 9F).

Dr. Davis said the claimant's ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions is mildly impaired and his ability is moderately impaired with regard to complex instructions and decisions.  The claimant's ability to interact appropriately with the public, interact appropriately with supervisors and interact appropriately with co-workers, responds appropriately to usual work situations and to changes in routine setting is moderately impaired.  Dr. Davis also said the mental capacity of this claimant should be considered as an add-on factor but in and of itself is not disabling; and decisions about his disability need to be based on the general medical condition.  (Exhibit 9F).

On December 12,2011, Linda Duke, PhD, completed a Psychiatric Review Technique Form (PRTF), and found that the claimant had mild restriction of activities of daily living; moderate difficulties in

maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. (Exhibit 11F).  Dr. Duke also completed a Mental Residual Functional Capacity Assessment (MRFC), and found the claimant had the following moderate limitations: in the ability to understand and remember detailed instructions; in the ability to carry out detailed instructions; in the ability to maintain attention and concentration for extended periods; and in the ability to interact appropriately with the general public.  Dr. Duke opined that the claimant has the ability to understand, remember, and carry out very short and simple instructions; attend for 2 hour periods; and have infrequent contact with the general public.  (Exhibit 12F).

On January 23, 2012, Dr. Hart completed a Residual Functional Capacity Questionnaire in which she found the claimant had the following limitations:  moderate restriction of activities of daily living; moderate difficulty in maintaining social functioning; marked deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere); and 4 or more episodes of deterioration or decompensation in a work or work-like setting which cause the claimant to withdraw from that situation or to experience exacerbation of signs and symptoms.  Based upon her evaluation of the claimant's psychiatric status, Dr. Hart opined that the claimant has the following limitations in his ability to do the following on a sustained basis in a routine work setting:  moderate limitation to understand, carry out, and remember instructions in a work setting; moderate to marked limitation to respond appropriately to supervision in a work setting; moderate to marked limitation to respond appropriately to co-workers in a work setting; and moderate limitation to perform simple tasks and repetitive tasks in a work setting. Dr. Hart said the claimant's medications cause side effects including lethargy and sedation.  She identified the claimant's diagnoses as organic affective and cognitive disorder (due to residual medical condition), chronic pain disorder, and cervical disc degeneration. (Exhibit 16F).

Dr. Hart also completed a Clinical Assessment of Pain (CAP) Form on January 23, 2012, and noted the claimant's pain is present to such an extent as to be distracting to the adequate performance of daily activities or work; and prescribed medication impacts the individual's work ability to the extent that medications cause side effects which would impose some limitations upon the claimant but not to such a degree as to create serious problems in most instances. (Exhibit 16F).

Dr. Hart completed another Residual Functional Capacity Questionnaire on December 20, 2012, and found the claimant had marked limitations in activities of daily living, social functioning, and concentration, persistence or pace.  She again estimated he would have 4 or more episodes of deterioration or decompensation in a work or work-like setting.  Dr. Hart opined that the claimant has moderate limitation to understand, carry out, and remember instructions in a work setting; moderate to marked limitation to respond appropriately to supervision in a work setting (due to frustration intolerance);  marked limitation to respond  appropriately  to  co-workers  in  a  work  setting  (due  to emotional dysregulation); and mild limitation to perform simple tasks and repetitive tasks in a work setting.  Dr. Hart said the claimant's medications cause side effects including  heat intolerance,  sedation, dizziness, fatigue, cognitive dulling, blurred vision, and disequilibrium. Dr. Hart commented that the claimant remains significantly impaired in overall functional capacity. (Exhibit 21F).

Dr. Hart also completed another CAP Form on December 20, 2012, and noted  the claimant's pain is present  to such an extent  as  to be distracting to the adequate performance of daily activities or work; and prescribed  medication  impacts  the  individual's  work  ability  to  the extent that medication side effects can be expected to be severe and to limit  effectiveness  due  to  distraction,  inattention,  and  drowsiness. (Exhibit 22F).

Despite the claimant's allegations that he suffers from depression and has been diagnosed with affective disorder, cognitive disorder, and GAD, the preponderance  of the documentary evidence reflects that his level of mental functioning is only moderately  impaired by his alleged mental  health symptomatology.   The claimant  said he can get along with authority figures, but cannot handle a lot of stress or changes in routine due to anxiety.  (Exhibit 6E).  The claimant also testified that he does not drive much due to anxiety, and being around a lot of people makes him nervous.  On March 19, 2012, Dr. Hart said the claimant's *periodic*  panic symptoms were better on his present medications, but still limits his interactions with others.  (Exhibit 20F).  Therefore, the residual  functional  capacity  allowed  for  the  claimant's  moderate impairment in interacting by limiting the claimant's contact with the public and working independently.   His anxiety has been allowed for with the limitation  to changes in routine being introduced  gradually over 1-2 days.

The  undersigned  notes  that  Dr. Hart circled cognitive deficits on her form including  diminished ability to think, impaired recent memory, poor concentration,  distractibility,  and  indecisiveness  in  2012  office

visits.  (Exhibit 5F and 20F).  However, Dr. Davis noted no significant concentration or memory problems during his consultative exam. (Exhibit 9F).  The undersigned has accounted for the claimant's alleged concentration and cognitive deficits with the limitation to performing simple, routine, repetitive tasks.

The undersigned notes that in Exhibit 7F, Dr. Hart assigned the claimant a GAF score of 49, which according to the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM-IV), would indicate "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  However, Dr. Hart later said the claimant was stable overall and she noted improvement with medications.  (Exhibits 10F and 20F).  The undersigned stresses that a GAF estimate is an unstandardized and hypothetical continuum that is more of a snapshot of an individual's functioning.  Indeed, the DSM-IV indicates that a GAF estimate is to be used by a clinician more in planning treatment, measuring its impact and in predicting outcome.  The DSM-IV further indicates that the GAF scale may be of use in tracking the clinical progress of individuals in global terms, using a single measure and, in most instances, ratings on the GAF scale are used only for the current period (i.e., the level of functioning at the time of the evaluation).

As for the opinion evidence, the undersigned assigns great weight to the findings and opinion of the examining psychologist, Dr. Davis in Exhibit 9F and the claimant's treating physician, Dr. Coats, in Exhibit 19F.  As a licensed psychologist, Dr. Davis is well qualified to evaluate the claimant's impairments and form conclusions regarding his mental symptoms, conditions, and resulting limitations; and his conclusions are consistent with and supported by the substantial evidence contained in the record, as well as by his own objective clinical examination findings.  Dr. Davis said the claimant has mild impairment with regard to understanding, remembering, and carrying out simple instructions and making judgments on simple work-related decisions and moderate impairment with regard to more complex instructions and decisions. He also assigned moderate limitation in terms of interacting with others and responding to usual work situations.

Dr. Davis's opinion is supported by Dr. Duke's findings and opinion in Exhibits 11F and 12F.  The undersigned also used the ratings assigned by Dr. Duke in the PRTF to determine the mental residual functional capacity.  As noted above, the claimant has mild restriction of activities of daily living and moderate difficulties in maintaining concentration, persistence or pace, causing the limitations of performing simple, routine, repetitive tasks.  The claimant has moderate difficulties in

maintaining social functioning, causing the limitations of occasional contact with the public, working in close proximity to others but independently, and occasionally adapting to changes in work setting that are introduced gradually.  The limitations assigned by Dr. Duke in the MRFC in Exhibit 12F are generally consistent with the mental residual functional capacity as set forth above.

The undersigned gives less weight to Dr. Hart's opinion in Exhibit 16F, as it is internally inconsistent and inconsistent with the rest of the records.  For example, she found the claimant had marked deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; yet, she said the claimant only had moderate limitation in the ability to understand, carry out, and remember instructions in a work setting.  Dr. Hart said the claimant had moderate to marked limitation in the ability to respond appropriately to others, but only assigned a moderate limitation in social functioning.  Dr. Hart also said the claimant is expected to have 4 or more episodes of deterioration or decompensation in a work or work-like setting; however, the claimant has never been hospitalized for mental health issues.  Finally, Dr. Hart said the claimant's medications cause side effects including lethargy and sedation; however, in the accompanying CAP form, she said the claimant's medication side effects would only impose some limitations upon the claimant but not to such a degree as to create serious problems in most instances.  (Exhibit 16F).

Dr. Hart's December 2012, Residual Functional Capacity Questionnaire and CAP forms in Exhibits 21F and 22F are given less weight for the same reasons.  While she assigned marked limitations concentration, persistence or pace, she also opined that the claimant has moderate limitation to understand, carry out, and remember instructions in a work setting and only mild limitation to perform simple tasks and repetitive tasks in a work setting.  Dr. Hart noted the claimant had moderate to marked limitation to respond appropriately to supervision in a work setting (due to frustration intolerance) and marked limitation to respond appropriately to co-workers in a work setting (due to emotional dysregulation).  However, the undersigned finds the claimant has a moderate impairment in interacting, as explained above, and this impairment has been allowed for in the residual functional capacity by limiting the claimant's contact with the public and working best independently.

The undersigned also gives less weight to Dr. Hart's opinions because they are inconsistent with the rest of the records.  First, in Exhibit lOF, Dr. Hart found that the claimant was not physically able to resume work.  However, Dr. Hart is a psychiatrist, and her opinion completely

contradicts Dr. Coats' August 2012 opinion that the claimant has no physically disabling impairments.   Dr. Coats said, "I see no reason medically why he should be disabled..." and he also noted the claimant had no physical complaints and did not appear to be in any discomfort. (Exhibit 19F). Furthermore, Dr. Donahoe's treatment records in Exhibit 3F reveal that the claimant's complaints of neck and shoulder pain improved with physical therapy, he had a normal shoulder x-ray, and the neck x-rays showed only some mild findings.   Dr. Hart's opinion is also inconsistent with Dr. Davis's opinion and the opinion of Dr. Duke in Exhibit 12F.   Dr. Davis's opinion that the claimant's depression  is an add-on factor is consistent with the claimant lack of mental health treatment.   Specifically, there are no mental health treatment records except for Dr. Hart and no emergent care or inpatient hospitalizations.

The undersigned also does not give significant weight to the portion of Dr. Hart's opinion in which she states that the claimant is totally disabled.   Social Security Rulings 96-2p and 96-5p indicate that treating physician opinions on issues reserved to the Commissioner of Social Security are never entitled to controlling weight or special significance. Since  Dr. Hart's opinion in Exhibits 5F and 8F concerns an issue (whether  the  claimant  is  disabled) reserved  to  the  Commissioner, it cannot be given controlling weight.

The record as a whole reflects that the claimant is capable of performing medium work as set forth above, and that he was not disabled for any 12 month period.   There is little to no objective support for the claimant's assertion that his impairments are of disabling severity.

**6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).**

\*      \*      \*

**7.      The claimant was born on October 29, 1958 and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability date (20 CFR 404.1563).**

**8.      The claimant has at least a high school education and is able to communicate in**
**English (20 CFR 404.1564).**

**9.      Transferability  of  job  skills  is  not  material  to  the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.22. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled medium occupational base, the undersigned asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors, the individual would be able to perform the requirements of representative occupations such as hand packager (DOT 920.587-018), with approximately 706,000 available positions in the national economy and approximately 8,000 available positions in the State of Alabama; warehouse worker (DOT 922.687-058), with approximately 506,000 available positions in the national economy and approximately 6,000 available positions in the State of Alabama; and linen room attendant (DOT 222.387-030), with approximately 1.9 million available positions in the national economy and approximately 27,000 available positions in the State of Alabama.

The undersigned also asked the vocational expert whether jobs would be available for the hypothetical individual with the residual functional capacity set forth above, except the individual would need frequent

breaks in addition to regular breaks occurring about 1-2 per day that would last approximately 30 minutes secondary to fatigue or would need approximately 1-2 extra breaks lasting 30 minutes per week. The vocational expert responded that the individual in either of these hypothetical situations would be unable to sustain work on full time basis. However, the record does not support the requirement for additional breaks as explained in detail above. The undersigned has specifically accounted for the claimant's alleged medication side effects in the residual functional capacity.

Although the vocational expert's testimony is inconsistent with the information contained in the Dictionary of Occupational Titles, there is a reasonable explanation for the discrepancy. The undersigned has accepted the vocational expert's testimony in accordance with SSR 00-4p, as she said it was consistent with the DOT except noted the DOT does not differentiate overhead reaching from other areas of reaching. Therefore, she relied on the DOT and its companion publications and her work history of approximately 24 years in rehabilitation and performing informal and formal job analyses during that time to identify the jobs above.

Based on the record as a whole, including the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11. The claimant has not been under a disability, as defined in the Social Security Act, from June 16, 2011, through the date of this decision (20 CFR 404.1520(g)).**

(Tr. at 40-53 (emphasis in original)). The Appeals Council affirmed the ALJ's decision

(Tr. 1-7), and, thus, the hearing decision became the final decision of the Commissioner

of Social Security.

## DISCUSSION

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation when

determining whether a claimant is disabled, which considers

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairments in the regulations; (4) if not, whether the claimant has the [residual functional capacity ("RFC")] to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.*, 457 Fed. App'x 868, 870 (11th Cir. 2012)[2] (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted).  The claimant bears the burden, at the fourth step, of proving that he is unable to perform his previous work.  *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors:  (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.  *Id.* at 1005. Although "a claimant bears the burden of demonstrating an inability to return to his past relevant work, the [Commissioner of Social Security] has an obligation to develop a full and fair record." *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted). If a plaintiff proves that he cannot do her past relevant work, as here, it then becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is capable—given his age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Phillips*, 357 F.3d at 1237; *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied,* 529 U.S. 1089 (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

---

[2]  "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that he can perform those jobs identified by the vocational expert during the administrative hearing, is supported by substantial evidence.  Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[3] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence."  *Davison v. Astrue*, 370 Fed. App'x 995, 996 (11th Cir. 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).   And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'"  *Id.* (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).

On appeal to this Court, the Plaintiff asserts four reasons why the Commissioner's decision to deny him benefits is in error (*i.e.*, not supported by substantial evidence): (1) the ALJ failed to give the proper deference to the opinions of the treating psychiatrist, Dr. Deborah J. Hart; (2) the ALJ failed to articulate linkage between the RFC and the evidence; (3) the ALJ failed to properly assess the credibility of the Plaintiff; and (4) the ALJ failed to pose a comprehensive hypothetical question to the vocational expert ("VE").  The undersigned will address the first three arguments

---

[3]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

within the context of the ALJ's RFC assessment and then consider the remaining issue of the ALJ's comprehensive hypothetical question.

## I.    The ALJ's RFC Assessment

Initially, the Court notes that the responsibility for making the RFC determination rests with the ALJ.  *Compare* 20 C.F.R. §§ 404.1546(c) & 416.946(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.") *with, e.g.,* *Packer v. Comm'r, Soc. Sec. Admin.*, 542 F. App'x 890, 891-92 (11th Cir. 2013) (per curiam) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." (internal citation omitted)). A plaintiff's RFC—which "includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, co-workers and work pressure[]"—"is a[n] [] assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms."  *Watkins*, 457 F. App'x at 870 n.5 (citing 20 C.F.R. §§ 404.1545(a)-(c) & 416.945(a)-(c)).  Here, the ALJ determined the Plaintiff's RFC as follows:

> **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), in function by function terms (SSRs 83-10 and 06-8p), with certain non-exertional restrictions associated with that level of exertion.  The claimant's specific capabilities during the period of adjudication have been the ability to sit for 6 hours in an 8-hour day; stand or**

**walk 6 hours in an 8-hour day; frequently lift 25 pounds and occasionally lift 50 pounds; occasionally perform overhead work and push/pull arm controls; and frequently push/pull leg controls. The claimant could work in a job that would not require him to climb ropes/ladders/scaffolds, work at unprotected heights or around dangerous machinery, or operate automotive equipment; and would not require concentrated exposure of 5 minutes or more to temperature extremes (such as the cold you would encounter in a freezer or heat such as that given off by a blow torch). The claimant could perform simple, routine, repetitive tasks; have occasional contact with the public; could work in close proximity to coworkers and supervisors, but would work best independently; and occasionally adapt to changes in work setting that are introduced gradually over the course of 1-2 days.**

(Tr. at 43-44 (emphasis in original)).

To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has "provide[d] a sufficient rationale to link" substantial record evidence "to the legal conclusions reached." *Ricks v. Astrue*, No. 3:10-cv-975-TEM, 2012 WL 1020428, at *9 (M.D. Fla. Mar. 27, 2012) (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)); *compare id. with Packer v. Astrue*, No. 11-0084-CG-N, 2013 WL 593497, at *4 (S.D. Ala. Feb. 14, 2013) ("'[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work.'"), *aff'd*, 542 F. App'x 890 (11th Cir. 2013);[4] *see also Hanna v. Astrue*, 395 Fed. Appx. 634, 636 (11th Cir. 2010) (per curiam) ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review. . . . Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not

---

[4]      In affirming the ALJ, the Eleventh Circuit rejected Packer's substantial evidence argument, noting, she "failed to establish that her RFC assessment was not supported by substantial evidence[]" in light of the ALJ's consideration of her credibility and the medical evidence. *Id.* at 892.

provide a meaningful basis upon which we can review [a plaintiff's] case." (internal citation omitted)).[5]   However, in order to find that the ALJ's RFC assessment is supported by substantial evidence, it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician. *See, e.g.*, *Packer*, 2013 WL 593497, at *3 ("[N]umerous court have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician."); *McMillian v. Astrue*, No. 11-00545-C, 2012 WL 1565624, at *4 n.5 (S.D. Ala. May 1, 2012) (noting that decisions of this Court "in which a matter is remanded to the Commissioner because the ALJ's RFC determination was not supported by substantial and tangible evidence still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that substantial and tangible evidence must—in all cases—include an RFC or PCE from a physician" (internal punctuation

---

[5]      It is the ALJ's (or, in some cases, the Appeals Council's) responsibility, not the responsibility of the Commissioner's counsel on appeal to this Court, to "state with clarity" the grounds for an RFC determination. Stated differently, "linkage" may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the Commissioner's decision.  *See, e.g.*, *Durham v. Astrue*, No. 3:08CV839-SRW, 2010 WL 3825617, at *3 (M.D. Ala. Sept. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e] what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision]' when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'" (quoting *Hanna*, 395 F. App'x at 636 (internal quotation marks omitted))); *id.* at *3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ ***could have*** relied . . . . There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion].  However, because the ALJ did not state his reasons, the court cannot evaluate them for substantial evidentiary support.  Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not conduct the analysis that the law requires him to conduct." (emphasis in original)); *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.").

altered and citation omitted)); *but cf. Coleman v. Barnhart,* 264 F. Supp. 2d 1007 (S.D. Ala. 2003).

### A.       The Opinion of Dr. Hart, the Plaintiff's Treating Psychiatrist

First, the Plaintiff argues that the ALJ erred by giving "less weight" to the opinions of Dr. Hart than the remaining opinion evidence in the record.  (*Id.* at 16-23). Dr. Hart provided her opinion through three (3) different avenues: (1) treatment records spanning from September 20, 2010 to December 20, 2012 (*id.* at 322-57, 372-394, 405-07 & 480-90); (2) two treating source statement letters (*id.* at 395-96); and (3) two RFC Questionnaire forms and accompanying Clinical Assessment of Pain ("CAP") forms (*id.* at 463-65 & 491-93).

In her treatment records, Dr. Hart noted that she has treated the Plaintiff since September 20, 2011.  (*Id.* at 331).  On November 10, 2011, she drafted a letter finding that as a result of exposure to neuro-toxins, Carbon Disulfide and Hydrogen Sulfide, the Plaintiff has several neuro-cognitive and psychological symptoms, including instability of mood and volatility of affect, social isolation, avoidance behavior, insomnia, low self-worth, self-denigration, dysthymia, anhedonia, apathy, anergy, and passive suicidal ideations.  (*Id.* at 373).  Dr. Hart said that the Plaintiff is not actively suicidal, but stressful situations and unpredictable environments worsen his problems with affective instability and volatility in mood.  (*Id.*).  She said there is also significant impairment in the Plaintiff's general cognitive and executive functioning, which cause difficulty following through with varied tasks, maintaining attention and focus, maintaining consistency in work performance and work-pace without becoming over extended and frustrated, and the Plaintiff's depression and self-imposed social isolation interferes with his ability to effectively perform many simple daily activities, attend social activities, attend to personal needs (shopping), or socialize with his family and

friends; and the Plaintiff has become increasingly isolated and withdrawn.  (*Id.*).  Dr. Hart diagnosed the Plaintiff with organic affective and cognitive disorder secondary to neurotoxin exposure; GAD; chronic, persistent pain disorder; chronic insomnia due to medical condition; irreversible neurological, orthopedic, and gastrointestinal disorders due to neuro-toxin exposures; and a global assessment of functioning ("GAF") score of 49.  (*Id.* at 374).    Dr. Hart also opined that the Plaintiff's symptoms and problems markedly interfere with his daily activities of living and overall functional capacity, limiting much of what he once could easily accomplish and his interpersonal relationships and ability to communicate effectively with the general public and family.  (*Id.*).  She also stated that the Plaintiff's symptoms are compounded by a combination of ongoing situational stressors, financial instability, occupational demise, as well as medical impairments and chronic pain, and his medication side effects further complicate the level of functional capacity, with lethargy, cognitive dulling, daytime sedation, dizziness and medication induced heat intolerance.  (*Id.*).  On November 28, 2011, Dr. Hart stated in a progress note that the Plaintiff remains on medical leave, as "has not reached a point physically where he is able to resume his previous level of physical activity."  (*Id.* at 406).

In Dr. Hart's first treating source statement letter, dated November 3, 2011 and addressed to the Plaintiff's prior employer, she states that the Plaintiff "remains in active medical treatment with medical leave of absence from all occupational duties" and "[a] return to duty is not expected in the near future.  He has followed through with investigating the possibility of long term disability options."  (*Id.* at 396).  In her second treating source statement letter, dated November 27, 2011 and addressed to the Plaintiff's insurance company, Dr. Hart reiterates that the Plaintiff "remains in active

medical treatment with medical leave of absence form all occupational duties."  (*Id.* at 395).

In Dr. Hart's first RFC Questionnaire, dated January 23, 2012, she indicated that the Plaintiff had a moderate restriction of activities of daily living; a moderate degree of difficulty in maintaining social functioning; marked deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere); four or more episodes of deterioration or decomposition in work or work-like setting which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors); moderate limitations in his ability to understand, carry out, and remember instructions in a work setting; moderate to marked limitations in his ability to respond appropriately to supervision and co-workers in a work setting; and moderate limitations in his ability to perform simple tasks and repetitive tasks in a work setting.  (*Id.* at 463).  She also indicated that the aforementioned limitations could be expected to last for 12 months or longer, she said that the Plaintiff's medications cause lethargy and sedation, she diagnosed him with organic affective and cognitive disorder (due to residual medical condition), chronic pain disorder, and cervical disc degeneration.  (*Id.* at 464).  In the accompanying CAP form, Dr. Hart indicated that pain is frequently present to such an extent as to be distracting to the Plaintiff's adequate performance of work activities and the medications can cause side effects which impose some limitations upon the Plaintiff but not to such a degree as to create serious problems in most instances.  (*Id.* at 465).

In Dr. Hart's second RFC Questionnaire, dated December 20, 2012, she indicated that the Plaintiff has a marked restriction of activities of daily living; a marked degree of difficulty in maintaining social functioning; marked deficiencies of concentration,

persistence, or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere); four or more episodes of deterioration or decomposition in work or work-like setting which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors); moderate limitations in his ability to understand, carry out, and remember instructions in a work setting; moderate limitations in his ability to respond appropriately to supervision in a work setting; marked limitations in his ability to respond appropriately to co-workers in a work setting; and mild limitations in his ability to perform simple tasks and repetitive tasks in a work setting.  (*Id.* at 491).  She indicated that the aforementioned limitations could be expected to last for 12 months or longer; the Plaintiff's medications cause heat intolerance, sedation, dizziness, fatigue, cognitive dulling, blurred vision, and disequilibrium; and the Plaintiff remains significantly impaired in overall functional capacity.  (*Id.* at 491-92).   In the accompanying CAP form, Dr. Hart indicated that pain is frequently present to such an extent as to be distracting to the Plaintiff's adequate performance of work activities and the medication side effects can be expected to be severe and to limit the Plaintiff's effectiveness due to distraction, inattention, drowsiness, etc.  (*Id.* at 465).

The ALJ assessed Dr. Hart's opinions, as well as the other opinion evidence in this case, as follows:

> As for the opinion evidence, the undersigned assigns great weight to the findings and opinion of the examining psychologist, Dr. Davis in Exhibit 9F and the claimant's treating physician, Dr. Coats, in Exhibit 19F.  As a licensed psychologist, Dr. Davis is well qualified to evaluate the claimant's impairments and form conclusions regarding his mental symptoms, conditions, and resulting limitations; and his conclusions are consistent with and supported by the substantial evidence contained in the record, as well as by his own objective clinical examination findings. Dr. Davis said the claimant has mild impairment with regard to understanding, remembering,  and carrying out simple instructions

and making judgments on simple work-related decisions and moderate impairment with regard to more complex instructions and decisions. He also assigned moderate limitation in terms of interacting with others and responding to usual work situations.

Dr. Davis's opinion is supported by Dr. Duke's findings and opinion in Exhibits 11F and 12F. The undersigned also used the ratings assigned by Dr. Duke in the PRTF to determine the mental residual functional capacity. As noted above, the claimant has mild restriction of activities of daily living and moderate difficulties in maintaining concentration, persistence or pace, causing the limitations of performing simple, routine, repetitive tasks. The claimant has moderate difficulties in maintaining social functioning, causing the limitations of occasional contact with the public, working in close proximity to others but independently, and occasionally adapting to changes in work setting that are introduced gradually. The limitations assigned by Dr. Duke in the MRFC in Exhibit 12F are generally consistent with the mental residual functional capacity as set forth above.

The undersigned gives less weight to Dr. Hart's opinion in Exhibit 16F, as it is internally inconsistent and inconsistent with the rest of the records. For example, she found the claimant had marked deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; yet, she said the claimant only had moderate limitation in the ability to understand, carry out, and remember instructions in a work setting. Dr. Hart said the claimant had moderate to marked limitation in the ability to respond appropriately to others, but only assigned a moderate limitation in social functioning. Dr. Hart also said the claimant is expected to have 4 or more episodes of deterioration or decompensation in a work or work-like setting; however, the claimant has never been hospitalized for mental health issues. Finally, Dr. Hart said the claimant's medications cause side effects including lethargy and sedation; however, in the accompanying CAP form, she said the claimant's medication side effects would only impose some limitations upon the claimant but not to such a degree as to create serious problems in most instances. (Exhibit 16F).

Dr. Hart's December 2012, Residual Functional Capacity Questionnaire and CAP forms in Exhibits 21F and 22F are given less weight for the same reasons. While she assigned marked limitations concentration, persistence or pace, she also opined that the claimant has moderate limitation to understand, carry out, and remember instructions in a work setting and only mild limitation to perform simple tasks and repetitive tasks in a work setting. Dr. Hart noted the claimant had moderate to marked limitation to respond appropriately to supervision in a work setting (due to frustration intolerance) and marked limitation to respond

appropriately to co-workers in a work setting (due to emotional dysregulation). However, the undersigned finds the claimant has a moderate impairment in interacting, as explained above, and this impairment has been allowed for in the residual functional capacity by limiting the claimant's contact with the public and working best independently.

The undersigned also gives less weight to Dr. Hart's opinions because they are inconsistent with the rest of the records.  First, in Exhibit l0F, Dr. Hart found that the claimant was not physically able to resume work.  However, Dr. Hart is a psychiatrist, and her opinion completely contradicts Dr. Coats' August 2012 opinion that the claimant has no physically disabling impairments.  Dr. Coats said, "I see no reason medically why he should be disabled..." and he also noted the claimant had no physical complaints and did not appear to be in any discomfort. (Exhibit 19F). Furthermore, Dr. Donahoe's treatment records in Exhibit 3F reveal that the claimant's complaints of neck and shoulder pain improved with physical therapy, he had a normal shoulder x-ray, and the neck x-rays showed only some mild findings.  Dr. Hart's opinion is also inconsistent with Dr. Davis's opinion and the opinion of Dr. Duke in Exhibit 12F.  Dr. Davis's opinion that the claimant's depression is an add-on factor is consistent with the claimant lack of mental health treatment.  Specifically, there are no mental health treatment records except for Dr. Hart and no emergent care or inpatient hospitalizations.

The undersigned also does not give significant weight to the portion of Dr. Hart's opinion in which she states that the claimant is totally disabled.  Social Security Rulings 96-2p and 96-5p indicate that treating physician opinions on issues reserved to the Commissioner of Social Security are never entitled to controlling weight or special significance. Since Dr. Hart's opinion in Exhibits 5F and 8F concerns an issue (whether the claimant is disabled) reserved to the Commissioner, it cannot be given controlling weight.

(Tr. at 50-51).

As the plaintiff's treating psychiatrist, Dr. Hart's opinions "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Gilabert v. Comm'r of Soc. Sec.,* 396 F. App'x 652, 655 (11th Cir. 2010) (per curiam) (quoting *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997)).  Good cause is shown when the: "(1) treating physician's opinion was not bolstered by the evidence; (2)

evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004)). "Where the ALJ articulate[s] specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error." *Id.* (quoting *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005)).

The Court finds that the ALJ has shown good cause by articulating specific reasons supported by substantial evidence for giving "less weight" to Dr. Hart's opinion. As the ALJ stated, Dr. Hart's conclusions in the two RFC Questionnaires and accompanying CAP forms are internally inconsistent and inconsistent with the rest of the records. In both questionnaires, Dr. Hart indicated that the Plaintiff has "marked" deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere) but only has a "moderate" limitation to understand, carry out, and remember instructions in a work setting. (*Id.* at 463 & 491). Not only are these responses seemingly inconsistent on their face, but they are inconsistent with the Plaintiff's own statements in his September 12, 2011 Function Report that he does not need any special reminders to take care of personal needs and the statements of Dr. Davis, an examining psychologist, that there were no indications of deficits in the Plaintiff's overall concentration or attention, and the Plaintiff was able to handle Serial 7's, make simple change, do simple arithmetic, count backward from 20 to 1, spell 'cat' backward without difficulty. (*Id.* at 177 & 401). Dr. Hart's opinion in the January 2012 RFC Questionnaire that the Plaintiff has a "moderate" to "marked" limitation to respond appropriately to supervision and co-workers in a work setting is also inconsistent with her opinion that the Plaintiff only has a "moderate" degree of difficulty in maintaining social functioning. (*Id.*).

In addition, Dr. Hart's opinion in the December 2012 RFC Questionnaire where she stated that the Plaintiff has a "marked" degree of difficulty in maintaining social functioning, a "moderate" to "marked" limitation to respond appropriately to supervision in a work setting (due to frustration intolerance) and a "marked" limitation to respond appropriately to co-workers in a work setting (due to emotional dysregulation) are inconsistent with Dr. Davis' statement in his mental examination that the Plaintiff has normal social relationships with his family and the Plaintiff's own statements in his September 12, 2011 Function Report that he spends time with his family at least once a week, attends church services on a regular basis, attends meetings at church once a month, can get along with authority figures.  (*Id.* at 179, 181 & 402).

In the January 2012 RFC Questionnaire, Dr. Hart also stated that the Plaintiff's medications cause side effects including "lethargy" and "sedation," however, in the accompanying CAP form, she said the Plaintiff's medication side effects only "impose some limitations upon [the Plaintiff] but not to such a degree as to create serious problems in most instances."  (*Id.* at 464-65).   Not only are these documents internally inconsistent as the ALJ indicated, they are also inconsistent with and unsupported by Dr. Hart's most recent treatment notes at the time she completed the January 2012 RFC Questionnaire and CAP form.  In a treatment progress note dated November 28, 2011, Dr. Hart indicated that she had conducted, *inter alia*, a "[r]eview of medication efficacy/SE profile," and that there "[n]o clinical indication for change in treatment plan."  (*Id.* at 406).  In fact, the Plaintiff completed a form for Dr. Hart on November 29, 2011, the following day, checking several boxes indicating medication side effects he was experiencing.  (*Id.* at 407).  Notably, the Plaintiff did not check the box associated with "Daytime Sedation (Sleepiness)."  (*Id.*).  Similarly, although Dr. Hart stated in her November 10, 2011 letter that the Plaintiff's medication side effects

complicate his level of functional capacity with lethargy and daytime sedation, the Plaintiff did not check the "Daytime Sedation (Sleepiness)" box on November 3, 2011, the most recent time he completed the same form before Dr. Hart drafted said letter. (*Id.* at 376).

In both RFC questionnaires, Dr. Hart stated that the claimant is expected to have 4 or more episodes of deterioration or decompensation in a work or work-like setting, but, as the ALJ indicated, this is unsupported by the rest of the records as the Plaintiff has never been hospitalized for mental health issues, and Dr. Davis stated that that the Plaintiff's mental capacity should be considered as an add-on factor but in and of itself is not disabling. (*See id.* at 334 & 418).

As for other inconsistencies with the rest of the record, the ALJ pointed out that Dr. Hart, a psychiatrist, states in a progress note dated November 28, 2011 that the Plaintiff "has not reached a point physically where he is able to resume his previous level of physical activity." (Tr. at 406). Yet Dr. Coats, the Plaintiff's treating internist, opined on August 27, 2012 that he sees "no reason medically why he should be disabled" and that the Plaintiff "has no physical complaints[,]" "denies pain[,] and "does not appear to be in any discomfort." (*Id.* at 477). Further, Dr. Donahoe, the Plaintiff's orthopedist, saw the Plaintiff three times between April 23 and May 7, 2010 for neck and shoulder pain and stated that the Plaintiff's complaints of neck and shoulder pain improved with physical therapy, his shoulder x-ray was normal, and his neck x-rays showed only some mild findings. (*Id.* at 231-33). While these visits were before the Plaintiff's alleged onset date, the Plaintiff has not followed up with Dr. Donahoe since. Dr. Cochran, the Plaintiff's cardiologist, who conducted a routine follow-up because of the Plaintiff's CAD on September 6, 2011, after the Plaintiff's onset date, stated that the Plaintiff was asymptomatic, well appearing, and had no acute

distress.  (*Id.* at 359-60).  For the foregoing reasons, the Court finds that the ALJ articulated good cause for giving "less weight" to Dr. Hart's opinions and, thus, did not commit reversible error.

### B.      The ALJ's Assessment of the Plaintiff's Credibility

Next, the Plaintiff argues that the ALJ erred in assessing the credibility of his testimony at the hearing before the ALJ about the severity of his impairments, symptoms, and disabilities.  The Eleventh Circuit has consistently and often set forth the criteria for establishing disability based on testimony about pain and other symptoms.  *See, e.g., Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citations omitted); *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991).

> [T]he claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. Failure to articulate reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.

*Wilson*, 284 F.3d at 1225 (internal citations omitted) (footnote added).

"20 C.F.R. § 404.1529 provides that once such an impairment is established, all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms ***must*** be considered in addition to the medical signs and laboratory findings in deciding the issue of disability."  *Foote v. Chater,* 67 F.3d 1553, 1561 (11th Cir. 1995) (emphasis added).  In other words, once the issue becomes one of credibility and, as set forth in SSR 96-7p, in recognition of the fact that a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence alone, the adjudicator (ALJ) in assessing credibility must consider, in addition to the objective medical evidence, the other factors/evidence set

forth in 20 C.F.R. § 404.1529(c).  More specifically, "[w]hen evaluating a claimant's subjective symptoms, the ALJ *must* consider evidence of the following factors: (i) the claimant's 'daily activities; (ii) the location, duration, frequency, and intensity of the [claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the [claimant took] to alleviate pain or other symptoms; (v) treatment, other than medication, [the claimant] received for relief . . . of pain or other symptoms; and (vi) any measures the claimant personally used to relieve pain or other symptoms.'" *Leiter v. Comm'r of Soc. Sec. Admin.*, 377 F. App'x 944, 947 (11th Cir. 2010) (emphasis added) (quoting 20 C.F.R. §§ 404.1529(c)(3)); *see also* SSR 96-7p ("In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence . . . that the adjudicator *must* consider in addition to the objective medical evidence when assessing the credibility of an individual's statements[.]" (emphasis supplied)).

> Subjective pain testimony that is supported by objective medical evidence of a condition that can reasonably be expected to produce the symptoms of which the claimant complains is *itself* sufficient to sustain a finding of disability." *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987) (citations omitted). However, if the ALJ decides not to credit a claimant's subjective complaints as to her pain, "he must articulate specific and adequate reasons for doing so." *Holt*, 921 F.2d at 1223. "Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." *Id.* (citation omitted). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (per curiam) (citation omitted).

*Leiter*, 377 F. App'x at 947.

In this case, the ALJ clearly recognized that Plaintiff's underlying "medically determinable impairments could reasonably be expected to cause the alleged

symptoms[.]"   (*Id.* at 44).   Yet the ALJ found that the Plaintiff's subjective complaints were not entirely credible.   (*Id.* ("[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are entirely credible[.]")).   It is the Plaintiff's position that the ALJ erred in discrediting the Plaintiff's testimony regarding the intensity, persistence, and limiting effects of the symptoms caused by his impairments is not credible.   (Doc. 10 at 26-28).   Upon review of the ALJ's decision, the Court finds that the ALJ articulated specific and adequate reasons for discrediting the Plaintiff's subjective testimony regarding pain and other symptoms.   While the Plaintiff contends that he suffers from medication side effects – namely, sleepiness, dizziness and drowsiness – the ALJ noted:

> [T]here is no record of the claimant complaining of medication side effects to his primary care physician, Dr. Coats, or to his orthopedist.   On the contrary, Dr. Coats' records consistently note the claimant reported no medication side effects.   In fact the only time the claimant told Dr. Coats that he could not sleep well, he attributed it to head congestion with persistent nocturnal cough.   Dr. Coats gave him Robitussin AC for a viral upper respiratory infection.

(Tr. at 46).   Indeed, the Plaintiff visited Dr. Coats, on two occasions (once on April 22, 2011, before the alleged onset date, and once on August 27, 2012, after the alleged onset date) denying pain and reporting no medication side effects or physical complaints both times.   (*Id.* at 45, 235 & 477).   As the ALJ also noted, none of treatment notes from the Plaintiff's orthopedist, Dr. Donahoe, reflect complaints about medication side effects.   (*See id.* at 231-33).

As the ALJ also noted, the Plaintiff visited his cardiologist, Dr. Glenn Cochran, on September 6, 2011 reporting that he had been doing well with his CAD symptoms, and Dr. Cochran said that the Plaintiff was asymptomatic and no associated symptoms were reported.   (*Id.* at 45 & 359-61).   In addition, as cited the ALJ, despite Dr. Hart's opinions about the Plaintiff's fatigue and sedation, she continually noted that the

Plaintiff was alert, coherent, cooperative, and fully oriented during mental status examinations.  (*Id.* at 46, 326, 347 & 490).  In addition, the undersigned notes that the ALJ considered the factors/evidence set forth in 20 C.F.R. § 404.1529(c) and 416.929(c) in assessing the Plaintiff's credibility.  For example, the ALJ discussed the Plaintiff's daily activities (*see id.* at 42 (noting that the Plaintiff has a "mild restriction" in activities of daily living and that the Plaintiff specifically indicated that "gets tired easily since he had a heart attack")) and the location, duration, frequency, and intensity of the Plaintiff's pain or other symptoms (*see id.* at 46 (noting that the Plaintiff testified that he spends the majority of his day sleeping, reported that neck and shoulder pain prohibit him from sleeping, and testified that he sleeps about 2-3 hours a day but is unable to sleep at night because he cannot seem to relax)).

The Plaintiff also argues the ALJ did not discuss two CAP forms completed by Dr. Hart, and, thus, Dr. Hart's opinions in the CAP forms regarding the Plaintiff's pain and medication side effects should be accepted as true under the Eleventh Circuit's opinion in *Hale v. Bowen*, 831 F.2d 1007 (11th Cir. 1987) that if an ALJ fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the ALJ has accepted that testimony as true.  (Doc. 10 at 27-28).  However, as previously explained in more detail, the ALJ did discuss the two CAP forms completed by Dr. Hart and properly gave her opinions "less weight" than the opinions of Dr. Coats and Dr. Davis.  Furthermore, Dr. Hart's "clinical judgment[s]" as reflected in her CAP forms do not constitute subjective pain testimony from the Plaintiff.  For these reasons, the Court finds that the ALJ articulated specific and adequate reasons for discrediting the Plaintiff's subjective testimony regarding the severity of his impairments, symptoms, and disabilities.  Therefore, the ALJ's adverse credibility determination is supported by substantial evidence, and the ALJ did not commit reversible error.

## C.     Remaining Aspects of the ALJ's RFC Determination

As for the remaining aspects of the ALJ's RFC determination, the Court finds that the ALJ provided a sufficient rationale to link substantial record evidence to the legal conclusions reached. Importantly, in establishing the Plaintiff's RFC, which means determining his "remaining ability to do work despite her impairments[,]" *Packer*, 542 F. App'x at 891—keeping a focus on the extent of those impairments as documented by the credible record evidence—the ALJ sifted through the relevant medical evidence of record (*see* Tr. at 40-51), along with the Plaintiff's testimony (*see id.* at 44-49), to conclude that he could:

> [S]it for 6 hours in an 8-hour day; stand or walk 6 hours in an 8-hour day; frequently lift 25 pounds and occasionally lift 50 pounds; occasionally perform overhead work and push/pull arm controls; and frequently push/pull leg controls . . .[;] work in a job that would not require him to climb ropes/ladders/scaffolds, work at unprotected heights or around dangerous machinery, or operate automotive equipment; and would not require concentrated exposure of 5 minutes or more to temperature extremes  (such as the cold you would encounter in a freezer or heat such as that given off by a blow torch) . . .[;] could perform simple, routine, repetitive tasks; have occasional contact with the public; could work in close proximity to coworkers and supervisors, but would work best independently; and occasionally adapt to changes in work setting that are introduced gradually over the course of 1-2 days.

(*Id.* at 43-44 (emphasis in original)).

For instance, the ALJ considered the Plaintiff's numerous medical records, including his chest-x-rays, electrocardiogram (EKG) test results, laboratory results, and various treatment notes and records from multiple physicians.  (*See id.* at 44-51). The ALJ also considered the Plaintiff's own function report regarding his abilities and daily activities and testimony at the hearing before the ALJ about the severity of her impairments, symptoms, and disabilities.  (*Id.* at 40, 42, & 44-49).

The Plaintiff specifically argues that the ALJ failed to articulate the linkage between her physical RFC determination and the record.  (*See* Doc. 10 at 23-26).  The Court disagrees.  In formulating her physical RFC determination, the ALJ discussed in detail the treatment history regarding the Plaintiff's heart condition, hypertension, diabetes, neck and back pain, as well as the relevant opinions of physicians, including Dr. Coats, the Plaintiff's treating internist, who noted that he sees "no reason medically why [the Plaintiff] should be disabled, but he will worth this out with the disability office.  He has not physical complaints."  (Tr. at 40-51).  The ALJ then specifically noted that he allowed for (1) the Plaintiff's symptoms related to his neck and shoulder complaints with the limit on overhead reaching in the RFC; (2) his hypertension, CAD status post CABG, and diabetes with the limitation on his ability to sit for 6 hours in an 8-hour day, stand or walk 6 hours in an 8-hour day, frequently lift 25 pounds and occasionally lift 50 pounds, occasionally perform overhead work and push/pull arm controls, frequently push/pull leg controls, work in a job that would not require him to climb ropes/ladders/scaffolds, work at unprotected heights or around dangerous machinery, or operate automotive equipment, and work in a job that would not require concentrated exposure of 5 minutes or more to temperature extremes; and (3) his symptoms related to his medication side effects with the limit to simple, routine, repetitive tasks and the limits on working at unprotected heights or around dangerous machinery, or operating automotive equipment.  (*Id.* at 41, 44 & 46).

The Plaintiff argues that the ALJ also erred by failing to develop the record by not obtaining a consultative evaluation to assess the Plaintiff's work-related physical capabilities.  (*See* Doc. 10 at 23).   While the ALJ has a "basic duty to a basic duty to develop a full and fair record," *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (per curiam), the ALJ "is not required to order a consultative examination as long as the

record contains sufficient evidence for the [ALJ] to make an informed decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007); *see also Hollis v. Colvin*, NO. 14-00268-B, 2015 WL 4429051, at *5-6 (S.D. Ala. July 20, 2015).   Here, the Court finds that the evidence of record, which includes an immense amount of physician treatment notes and reports completed by the Plaintiff himself, contains sufficient evidence for the ALJ to have made an informed decision regarding the Plaintiff's physical RFC.  Accordingly, the Court finds that the ALJ did not err by failing to further develop the record. The ALJ's analysis shows to this Court that the ALJ considered the Plaintiff's physical condition as a whole in determining his physical RFC, and, thus, the ALJ's physical RFC determination provides an articulated linkage to the medical evidence of record.

The Court also finds that the ALJ properly articulated the linkage between her mental RFC determination and the record.   In formulating her mental RFC determination, the ALJ discussed in detail the treatment history regarding the Plaintiff's depression, affective disorder, cognitive disorder, and GAD, as well as the relevant opinions of his physicians.  (Tr. at 46-51).  As already discussed, the ALJ properly gave "less weight" to the opinions of Dr. Hart than the opinions of Dr. Davis and Dr. Coats. The ALJ accordingly relied on the opinion evidence of Dr. Davis and Dr. Coats and the Plaintiff's own function report regarding his abilities and daily activities to determine that the Plaintiff's social functioning and interacting, mental functioning, concentration, persistence or pace are only moderately impaired.  (*Id.* at 42-43 & 49).  The ALJ specifically noted that she allowed for the Plaintiff's moderate impairment in social functioning and interacting by limiting the Plaintiff's contact with the public and working independently; his anxiety with the limitation to any changes in his routine being introduced gradually over 1-2 days; and his alleged concentration and cognitive

deficits with the limitation to perform simple routine, repetitive tasks. (*Id.* at 49). The ALJ also found that this mental RFC was generally consistent with the opinions of Dr. Duke, a non-examining medical consultant who completed a psychiatric review technique form and a mental RFC assessment. (*See id.* at 50 & 408-25).[6]

This analysis shows to this Court that the ALJ considered the Plaintiff's mental condition as a whole in determining his mental RFC. Accordingly, as was the case with her physical RFC determination, the ALJ's mental RFC determination provides an articulated linkage to the medical evidence of record. This linkage requirement is simply another way to say that, in order for this Court to find that an RFC determination is supported by substantial evidence, ALJs must "show their work" or, said somewhat differently, show *how* they applied and analyzed the evidence to determine a plaintiff's RFC. *See, e.g., Hanna*, 395 F. App'x at 636 ("[An ALJ's] decision [must] provide a meaningful basis upon which we can review [a plaintiff's] case"); *Ricks*, 2012 WL 1020428, at *9 (an ALJ must "explain the basis for his decision"); *Packer*,

_____

[6]      The ALJ stated that she also used the Dr. Duke's ratings in her psychiatric review technique form to determine the Plaintiff's mental RFC. (*Id.* at 50). Because the ALJ articulated good cause to give "less weight" to the opinions of Dr. Hart, the ALJ did not err in utilizing a non-examining state agency medical consultant's opinion that the Plaintiff has a mild restriction of activities of daily living, a moderate difficulty in maintaining social functioning, a moderate difficulty in maintaining concentration, persistence or pace, and no extended episodes of decompensation. (Tr. at 50 & 418). *See Thomas v. Colvin*, No. 11-00569-B, 2015 WL 4458861, at *14 & n.8 (S.D. Ala. July 21, 2015) ("Because the ALJ had good cause to discount [the treating physician's] opinions, the opinions of non-examining State Agency [physician] do not conflict with any credible examining source, and thus, they were properly considered by the ALJ."); *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) ("The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.' 20 C.F.R. § 404.1527(f)(2)(i). The ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources. *Edwards v. Sullivan*, 937 F.2d 580, 584-85 (11th Cir. 1991).").

542 F. App'x at 891-92 ("[An ALJ must] provide *enough reasoning* for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole[]" (emphasis added)).  Thus, by "showing her work," the ALJ has provided the required "linkage" between the record evidence and her physical and mental RFC determinations necessary to facilitate this Court's meaningful review of her decision. For these reasons, the Court finds that the ALJ's RFC determination is supported by substantial evidence.

## II.     The ALJ's Hypothetical Question to the VE

At the fifth step of the Commissioner's evaluation, the Commissioner must establish that a significant number of jobs exist in the national economy that the claimant can perform given his RFC, age, education, and work experience. *See, e.g., Bellew v. Acting Comm'r of Soc. Sec.*, 605 F. App'x 917, 930 (11th Cir. 2015) (citation omitted).  "An ALJ may make this determination either by applying the Medical Vocational Guidelines or by obtaining the testimony of a vocational expert." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (citing *Phillips v. Barnhart,* 357 F.3d 1232, 1239-40 (11th Cir. 2004)).  Here, of course, in finding that the Plaintiff could perform other work existing in significant numbers in the national economy (*see id.* 52-53), "the ALJ relied exclusively on the testimony of a vocational expert[.]"   *Dial v. Comm'r of Soc. Sec.*, 403 Fed. App'x 420, 421 (11th Cir. 2010).  "'In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.'" *Winschel*, 631 F.3d at 1180 (quoting *Wilson v. Barnhart,* 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam)); *see also Dial*, 403 Fed. App'x at 421 (where ALJ failed to include all of the claimant's "employment limitations in the hypothetical questions posed to the VE . . ., the VE's testimony did not constitute substantial evidence upon which the ALJ could rely.").

In this case, the Plaintiff contends that the Commissioner erred in finding that he can perform work existing in significant numbers in the national economy because the hypothetical question used by the ALJ in her decision did not include his moderate limitation in ability to maintain concentration, persistence, or pace found by the ALJ earlier in the sequential evaluation process.  (*See* Doc. 10 at 28-30).[7]  To the contrary, the Defendant argues that the ALJ accommodated such moderate limitations with restrictions consistent with unskilled work.  (*See* Doc. 11 at 9-11).

The hypothetical question posed by the ALJ to the VE in this case did not explicitly include the moderate limitation in the Plaintiff's ability to maintain concentration, persistence, or pace.  However, the Eleventh Circuit has held that an ALJ may account for a claimant's limitations in concentration, persistence, or pace by

---

[7]        The ALJ posed the following relevant hypothetical to the VE in this case: "I would like for you to assume an individual that is the same age as Mr. Eaton, has the same education and same work background.  This individual could sit for, approximately, six houses of an eight-hour day and stand or walk, approximately, six hours of an eight-hour day.  This individual could frequently lift 25 pounds and occasionally lift 50 pounds.  This individual would have not limitations with regard to the upper extremities with regard to grasping, feeling, handling or fingering.  This individual could occasionally perform overhead work and could occasionally push and pull arm controls.  The individual could frequently push and pull leg controls.   This individual would have no limitations with regard to the postural requirements of work, such as stooping, kneeling, crouching, crawling, balancing or climbing with the exception that the individual would be able to climb ropes, ladders or scaffolding.  The individual would be precluded from climbing or working at unprotected heights, working around dangerous machinery or operating automotive equipment.  The individual would also – could not have concentrated exposure of five minutes or more to temperature extremes.  And, by temperature extremes, I mean the cold that you would encounter in a freezer or the heat such as that, that would be let off from like a blowtorch.  The individual could perform simple, routine, repetitive tasks.  The individual could have occasional contact with the public.  The individual could work in close proximity to coworkers and supervisors, but would work best independently.   The individual could occasionally adapt to changes in the work setting. However, these changes should be introduced gradually over the course of one to two days. Based on this hypothetical question, could you identify any occupations that this hypothetical individual could perform, including any of the past work of Mr. Eaton?"  (Tr. at 72-73).  In response to this hypothetical question, the VE testified that the hypothetical individual could perform the work of three occupations: hand packager, warehouse worker, and linen room attendant.  (*Id*. at 73-74).

limiting the hypothetical to simple, routine tasks or unskilled work "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence and pace."  *Duval v. Comm'r of Soc. Sec.*, 628 F. App'x 703, 712 (11th Cir. 2015) (citing *Winschel*, 631 F.3d at 1180)); *Thornton v. Comm'r of Soc. Sec.*, 597 F. App'x 604, 611-12 (11th Cir. 2015) ("The hypothetical the ALJ posed specified that the VE should assume that [the claimant] could only perform 'simple, non-detailed tasks.' There was substantial evidence to support this determination. . . . Therefore, the ALJ's hypothetical was not deficient because it did not specifically refer to [the claimant's] limitations in maintaining concentration, persistence, and pace."); *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 872 (11th Cir. 2011) ("[T]he ALJ's restriction to simple instructions and simple tasks in the first hypothetical question sufficiently accounted for Jarrett's limitations in concentration, persistence and pace because, despite these limitations, the medical evidence in the record demonstrated that Jarrett retained the ability to follow simple instructions and complete simple tasks.").

Here, the ALJ's relevant hypothetical question limited the Plaintiff to performing "simple, routine, repetitive tasks."  (Tr. at 73).  As the ALJ noted in her decision, the Plaintiff "was able to handle Serial 7's, make simple change, do simple arithmetic, count backward from 20 to 1, and spell 'cat' backward without difficulties" during his consultative psychological exam with Dr. Davis despite the Plaintiff's moderate difficulties regarding concentration, persistence, or pace.  (*Id.* at 42-43 & 401).  Further, Dr. Davis, whose opinion, as explained in more detail above, the ALJ gave "great weight," opined that the Plaintiff's ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions is mildly impaired, and the Plaintiff's mental capacity is not disabling in and

of itself.  (*Id.* at 48 & 403).  Therefore, the ALJ's restriction to simple, routine, repetitive tasks in the first hypothetical question sufficiently accounted for the Plaintiff's limitations in concentration, persistence and pace because, despite these limitations, the medical evidence in the record demonstrated that he retained the ability to engage in simple, routine, and repetitive tasks.  Accordingly, the ALJ's hypothetical question was proper and substantial evidence supports the ALJ's finding that there are a significant number of jobs in the national economy that the Plaintiff can perform.

## CONCLUSION

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying the Plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 4th day of April 2016.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**